ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————

No. 22-3015
————————————

UNITED STATES OF AMERICA,                                   Appellee,

   v.

JOSEPH SMITH,                                               Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
CAROLINE BURRELL
MONA SEDKY
\* DAVID B. GOODHAND, DC Bar 438844
Assistant United States Attorneys
\* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
Cr. No. 19-324 (BAH)                    (202) 252-6829

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee states as follows:

### Parties and Amici

The parties to this appeal are appellant, Joseph Smith, and appellee, the United States of America.

### Rulings Under Review

This is an appeal from two unpublished orders by the Honorable Beryl A. Howell, denying Smith's motions to dismiss his indictment and to suppress evidence (JA239-312, 101-128, respectively). Smith also challenges the denial of his motion to exclude the government's case agent from the courtroom, *see* Fed. R. Evid. 615(b), and the admission of purported lay-opinion testimony, *see* Fed. R. Evid. 701.

### Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are reproduced in the addendum to Smith's brief.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE.............................................. 1

    Background.................................................................................2

        The Government's Case.....................................................2

        The Defense Case ..........................................................10

SUMMARY OF ARGUMENT........................................................11

ARGUMENT ...........................................................................13

    I.   The District Court Properly Rejected Smith's Claim that his Jury Was Not Drawn from a Fair Cross-Section of the Community. ...............................................................13

       A.   Applicable Legal Principles and Standard of Review........13

       B.   Relevant Procedural History .............................................14

       C.   Considering Both Absolute- and Comparative-Disparity Percentages, the District Court Correctly Concluded that Smith Failed To Show Unfair and Unreasonable Representation. ...........................................21

       D.   The District Court Correctly Concluded that Smith also Failed To Show Systematic Exclusion. .......................26

    II.  The District Court Properly Declined to Suppress Smith's Cellphones and Computer. ..........................................29

       A.   Relevant Procedural History .............................................30

       B.   Standard of Review............................................................34

       C.   The District Court Correctly Concluded the Warrant Was Sufficiently Particular. .............................................34

D.   Alternatively, the District Court Properly Found, the Good-Faith Exception Precluded Suppression of Smith's Phones and Computer. ...........................................41

III.   The District Court Properly Exercised Its Discretion in Permitting the Government's Case Agent To Remain in the Courtroom. ..................................................................45

A.   Applicable Legal Principles and Standard of Review ........45

B.   Relevant Procedural History ..............................................46

C.   The District Court Properly Declined To Exclude the Government's Designated Representative from the Courtroom. .......................................................................48

IV.   The District Court Did Not Plainly Err in Allowing Agent Schnur To Provide Limited Expert Testimony About the Origins of Certain Text Messages on Smith's Motorola Cellphone. ........................................................................52

A.   Relevant Procedural History ..............................................53

B.   The District Court Properly Admitted Agent Schnur's Expert Testimony After the Government Carefully Laid a Foundation for It. ...................................................56

C.   Any Error Was Harmless. ..................................................61

CONCLUSION ........................................................................................63

iv

# TABLE OF AUTHORITIES*

**Cases**

*Bates v. United States*, 473 Fed. App'x 446 (6th Cir. 2012) ...................27

*Berghuis v. Smith*, 559 U.S. 314 (2010)............................................ 13, 21

*Bounds v. Smith*, 430 U.S. 817 (1977) ......................................................29

*Bradshaw v. Perdue*, 319 F. Supp. 3d 286 (D.D.C. 2018)......................48

*Castaneda v. Partida*, 430 U.S. 482 (1977)......................................25, 26

*Duren v. Missouri*, 439 U.S. 357 (1979) ..................................... 13, 26, 29

*Howell v. Superintendent Rockview SCI*, 939 F.3d 260 (3d Cir.),
    *cert. denied*, 141 S. Ct. 275 (2020) ......................................................22

*Israel v. United States*, 109 A.3d 594 (D.C. 2014) ...........................27, 28

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................................61

*Lambrix v. Singletary*, 520 U.S. 518 (1997)............................................50

*Maryland v. Garrison*, 480 U.S. 79 (1987)..............................................35

*Massachusetts v. Shepard*, 468 U.S. 981 (1984) ....................................42

*Puckett v. United States*, 556 U.S. 129 (2009) ........................................57

*Queen v. WMATA*, 842 F.2d 476 (D.C. Cir. 1988)...................... 46, 49, 51

*Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), *rev'd on other grds*,
    *Berghuis v. Smith*, 559 U.S. 314 (2010) ..............................................28

---

\*   Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Bass*, 785 F.3d 1043 (6th Cir. 2015) ............................ 40

*United States v. Bobo*, 586 F.2d 355 (5th Cir. 1978) ............................. 51

*United States v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015) ....................... 60

*United States v. Bryant*, 523 F.3d 349 (D.C. Cir. 2008 ......................... 24

*United States v. Burke*, 633 F.3d 984 (10th Cir. 2011) .......................... 36

*United States v. Burroughs*, 613 F.3d 233 (D.C. Cir. 2010) .................. 49

*United States v. Castro*, 881 F.3d 961 (6th Cir. 2018) ........................... 36

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) ............ 23

*United States v. Clifford*, 640 F.2d 150 (8th Cir. 1981) ......................... 23

*United States v. Cooper*, 949 F.3d 744 (D.C. Cir. 2020) ....................... 45

* *United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) ...................... 35, 36

*United States v. Davis*, 854 F.3d 1276 (11th Cir. 2017) .................. 22, 25

*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997) .............. 13, 25

*United States v. Edwards*, 34 F.4th 570 (7th Cir.),
   *cert. denied*, 143 S. Ct. 307 (2022) ...................................................... 49

*United States v. Eiland*, 738 F.3d 338 (D.C. Cir. 2013) ........................ 61

*United States v. Garcia*, 121 F.3d 704 (5th Cir. 1997) .......................... 22

*United States v. Gendron*, 18 F.3d 955 (1st Cir. 1994) .......................... 38

*United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017) ............... 38, 39

*United States v. Grisham*, 63 F.3d 1074 (11th Cir.1995) ...................... 19

*United States v. Guzman*, 454 N.Y.S.2d 852 (N.Y. App. Div. 1982) 27, 28

*United States v. Hay*, 231 F.3d 630 (9th Cir. 2000) .............................. 36

*United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014)
    (en banc) ................................................................................. 14, 17

*United States v. Kelsey*, 917 F.3d 740 (D.C. Cir. 2019) .......................... 59

*United States v. Kezerle*, 99 F.3d 867 (7th Cir. 1996) ........................... 50

*United States v. King*, 227 F.3d 732 (6th Cir. 2000) .............................. 34

\* *United States v. Leon*, 468 U.S. 897 (1984) ............................... 33, 41, 44

*United States v. Mann*, 592 F.3d 779 (7th Cir. 2010) ........................... 41

\* *United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990) ... 35, 36, 41, 42

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) ....................... 25

*United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020),
    *cert. denied*, 142 S. Ct. 145 (2021) ..................................................... 56

*United States v. Morgan*, 45 F.4th 192 (D.C. Cir.),
    *cert. denied*, 143 S. Ct. 510 (2022) ..................................................... 61

*United States v. Murphy*, 1996 WL 341444 (N.D. Ill. June 18, 1996) .... 27

*United States v. Orange*, 447 F.3d 792 (10th Cir. 2006) ................. 22, 27

*United States v. Ortiz*, 897 F. Supp. 199 (E.D. Pa. 1995) ...................... 27

*United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) ........................ 52

*United States v. Pindell*, 336 F.3d 1049 (D.C. Cir. 2003) ...................... 34

*United States v. Quiroz*, 137 Fed. App'x 667 (5th Cir. 2005) ................ 19

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) .......................... 27, 28

\* *United States v. Savage*, 970 F.3d 217 (3d Cir. 2020),
   *cert. denied*, 142 S. Ct. 481 (2021) .................................... 14, 21, 22, 24

*United States v. Shinault*, 147 F.3d 1266 (10th Cir. 1998) ................... 21

*United States v. Smith*, 640 F.3d 358 (D.C. Cir. 2011).................... 60, 61

*United States v. Spencer*, 530 F.3d 1003 (D.C. Cir. 2008)............... 43, 44

*United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996) ..................... 24

*United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011) ........................... 40

*United States v. Vaughn,* 830 F.2d 1185 (D.C. Cir.1987)...................... 38

*United States v. Ventresca*, 380 U.S. 102 (1965)................................... 38

*United States v. Wagner*, 951 F.3d 1232 (10th Cir. 2020) ..................... 40

*United States v. Walker*, 545 F.3d 1081 (D.C. Cir. 2008) ...................... 24

*United States v. Weaver*, 267 F.3d 231 (3d Cir. 2001) ........................... 21

*United States v. Williams (Henry)*, 827 F.3d 1134
   (D.C. Cir. 2016) ............................................................................ 56, 59

*United States v. Williams (John)*, 212 F.3d 1305 (D.C. Cir. 2000) ........ 60

*United States v. Wong*, 334 F.3d 831 (9th Cir. 2003) ............................. 34

*Walton v. Arizona*, 497 U.S. 639 (1990), *overruled on other grds*,
   *Ring v. Arizona*, 536 U.S. 584 (2002) ................................................. 50

**Statutes and Rules**

18 U.S.C. § 2251(a) ................................................................... 2

18 U.S.C. § 2422(b) ................................................................... 2

28 U.S.C. § 1861 ...................................................................... 14

28 U.S.C. § 1867(d) .................................................................. 16

D.C. Code § 22-3002(a)(1) ....................................................... 2

D.C. Code § 22-3008 ................................................... 2, 12, 36

D.C. Code § 22-3020(a)(2) ....................................................... 2

Fed. R. Crim. P. 51(b) ...................................................... 49, 57

Fed. R. Crim. P. 52(a) .............................................................. 61

Fed. R. Evid. 615 ........................................................ 45, 46, 47

Fed. R. Evid. 615(b) .................................................... 12, 45, 52

Fed. R. Evid. 701(c) ................................................................ 56

Fed. R. Evid. 702 .............................................. 12, 56, 57, 59

**Other References**

A. Leopold, *Constitutionalizing Jury Selection in Criminal Cases: A Critical Evaluation*, 86 Geo. L.J. 945 (1998) .......................25

J. Heyman, *Introducing the Jury Exception: How Equal Protection Treats Juries Differently*, 69 N.Y.U. Ann. Surv. Am. L. 185 (2013) ...25

N. Chernoff, *Black to the Future: The State-Action Doctrine and the White Jury*, 58 Washburn L.J. 103 (2019) ....................................29

S. Chhablani, *ReFraming the Fair Cross-Section Requirement*, 13 U. Pa. J. Const. L. 931 (2011) .........................................................25

Wright & Miller, *Federal Practice and Procedure* § 376 (4th ed. 2022) ...............................................................................23, 46

# ISSUES PRESENTED

I. Whether the district court properly denied Smith's motion to dismiss his indictment, where he failed to demonstrate a prima facie violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community?

II. Whether the district court properly declined to suppress Smith's cellphones and computer, where the search warrant for his apartment sufficiently particularized the place to be searched and the items to be seized?

III. Whether the district court abused its discretion in declining to exclude the government's case agent from the courtroom where, in compliance with Fed. R. Evid. 615(b), the United States designated the agent as its representative?

IV. Whether the district court plainly erred in permitting the government's case agent to opine about a cellphone extraction report where, consistent with Smith's request, the prosecutor laid a foundation for the agent's testimony by carefully soliciting her significant experience with such reports and her knowledge about their contents?

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 22-3015

————————————————

UNITED STATES OF AMERICA,                                    Appellee,

v.

JOSEPH SMITH,                                              Appellant.

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————

BRIEF FOR APPELLEE

————————————————

## COUNTERSTATEMENT OF THE CASE

For eleven months (between May 2016 and April 2017), 57-year-old appellant, Joseph Smith, sexually abused his 13-year-old stepdaughter (AS).[1] As a result, in 2019, a federal grand jury charged him with 19 counts, alleging violations of both federal law and the D.C. Code (see

---

[1] For privacy purposes, we do not identity Smith's minor victim, her mother, or her sister.

Joint Appendix (JA) at 8). Before trial, the government dismissed nine of these counts (see JA249 n.8). Following a trial in October 2021, a jury convicted Smith of the remaining ten counts: production of child pornography; possession of child pornography; enticing a minor (*see* 18 U.S.C. §§ 2251(a), 2252(a)(4)(B), and 2422(b)); and seven counts of child sexual abuse (*see* D.C. Code §§ 22-3002(a)(1), -3008, and -3020(a)(2)) (JA313-14). On February 25, 2022, Judge Beryl A. Howell sentenced Smith to life imprisonment on the federal charges and a concurrent term of life imprisonment without release on the D.C. Code offenses (JA315). Smith timely appealed on March 7, 2022 (JA322-23).

## Background

### *The Government's Case*

In the summer of 2015, soon after 12-year-old AS finished sixth grade, her father died (10/21/21:26-28). AS had been living in Florida with her father, her mother, and her younger sister (10/21/21:26). Soon after AS's father's death, however, AS's mother, AS, and AS's sister moved into Smith's one-bedroom apartment at 1301 C Street, SE

(10/21/21:29-30).[2] Once there, AS's mother was in charge of "nothing"; instead, Smith "control[led]" "[e]verything" – "[m]oney, food, buying clothes, the apartment" (10/21/21:121).

After relocating to Washington, AS began seventh grade (10/21/21:31; Exhs. 82A, B (school records)). AS had a difficult time in her new school, where the other children "bullied" her and she "felt weak" (10/21/21:33-34). To better fit in, AS tried changing her clothes and her hair (10/21/21:34). Smith helped AS by "pay[ing]" for her hair and purchasing her new clothes and shoes (10/21/21:34). During this time, Smith treated AS with "kindness" – "he was nice; he was giving us things" (10/21/21:31).

Smith's treatment of AS changed dramatically, however, when he approached her and, in a low voice, said, "Sooner or later you have to start sucking some dick" (10/21/21:37-38). No one had ever said anything like this to AS (10/21/21:37). AS was "scared" and told her mother about Smith's threat (10/21/21:38). AS's mother spoke to Smith but he denied making the threat, and AS's mother told her, "'Don't worry about it'"

---

[2] In November 2015, soon after AS, AS's mother, and AS's sister arrived in Washington, AS's mother married Smith (10/25/21:80-81, 91).

(10/21/21:38-39). Though AS had believed that, by reporting Smith's threat to her mother, they would "leave" his apartment, AS's mother never again spoke to AS about Smith's threat and didn't do anything to address it (10/21/21:39-40). AS felt "stupid" and concluded there was "no point" in reporting anything about Smith to her mother (10/21/21:39). Further, AS determined, *she* would have "to protect" her younger sister, who was only seven years old (10/21/21:40).

Smith soon made good on his threat. In mid-May 2016, AS's mother, who had chronic asthma, was hospitalized for several days (10/21/21:40-41, 47; Exh. 94 (hospital records)).[3] Taking advantage of AS's mother's absence, Smith put AS's younger sister in her bath and placed a dresser in front of the bathroom door "in case [she] opened" it (10/21/21:42, 50). Smith then walked "into the bedroom, shaking his penis, walking toward [AS]" (10/21/21:42). Smith put "his penis into [AS's] mouth," commanding her to "'put your pretty lips on this'" (10/21/21:42-43). AS did not believe she could say "no" because she was "frightened" of Smith "hitting" her (10/21/21:44). Smith "thrust[ ] in and out of [AS's] mouth" and ultimately

---

[3] AS's mother was hospitalized on numerous multi-night occasions between April 2016 and May 2017 (10/21/21:240-47; Exh. 94).

ejaculated in AS's mouth (10/21/21:43, 48).[4] AS felt "unclean[ ]" because
it was "disgusting" (10/21/21:44). AS also felt "hurt" because she had
promised her mother that, "[i]f anybody ever touched [her]," she would
"tell" her mother (10/21/21:44).

Between May 2016 and April 2017, Smith repeatedly forced AS to
perform oral sex on him (10/21/21:49-56). Eventually, Smith did so even
when AS's mother was in the apartment since her asthma medication
made her a "heavy sleeper" (10/21/21:50). Smith also abused AS during
her mother's subsequent hospitalizations or when her mother was
"picking up" AS's younger sister (10/21/21:66; see note 3 *supra*). AS never
told her mother about Smith's abuse because, given her mother's inaction
in the face of Smith's initial threat, AS believed her mother "wouldn't do
anything about it" (10/21/21:55; see also *id.* at 45). Moreover, Smith told
AS that, if AS told her mother, AS's mother "would hate [her] and put
[her] in an adoption home" (10/21/21:55, 81-82). Further, AS believed
Smith "would hurt [her]" if she told anyone – "he was bigger than [AS]"

---

[4] This sexual assault was charged in Count Four (JA135).

(10/21/21:55-56). On several occasions, Smith also took AS's cellphone,[5] and told her she had to perform oral sex "to get it back" (10/21/21:56).[6]

Smith also "started putting his mouth to [AS's] vagina" (10/21/21:61). The first time Smith did this, AS tried "to get away," but Smith "pull[ed] [her] back" by placing his arms "[a]round [her] thighs" (10/21/21:62-63).[7] Thereafter, Smith either performed oral sex on AS or had AS perform oral sex on him two to three times a week (10/21/21:66).

Smith also began threatening to "have sex" with AS when she turned fourteen, in June 2017 (10/21/21:67, 84).[8] Smith said such sex would "improve [her] body," making it more mature (10/21/21:67, 84).

---

[5] Smith had bought AS this iPhone (202-368-3158) and paid the T-Mobile subscriber bills (10/21/21:70, 229-32; Exh. 83).

[6] Once, AS bit Smith's penis because she was "angry" and "frustrated" with the "whole situation"; Smith "popped" her on the head (10/21/21:107-08). This sexual assault was charged in Count Five (JA135-36).

[7] This sexual assault was charged in Counts Six and Seven (JA136-37). On another occasion, Smith "nibbl[ed]" AS's vagina, which caused her a "little pain" (10/21/21:109-10). This sexual assault was charged in Counts Eight and Nine (JA137-38). Additionally, AS's mother once interrupted Smith performing oral sex on AS in the living room (10/21/21:111-13). This sexual assault was charged in Count Ten (JA138-39).

[8] AS had turned thirteen in June 2016, soon after Smith had first forced her to perform oral sex (10/25/21:91-92).

Additionally, Smith repeatedly threatened AS with anal sex, which he said she wouldn't "get pregnant from" (10/21/21:73, 82).

Smith also directed AS to provide him nude photos of her breasts, vagina, and buttocks, which she did using her cellphone (10/21/21:98-99). Indeed, if Smith did not like a photo that AS had sent him, Smith would demand that she "[r]etake" it (10/21/21:99). After AS sent Smith photos, pursuant to his instructions she would delete them from her phone (10/21/21:99-100).[9]

In addition to the nude photographs of AS, law-enforcement personnel recovered numerous sexually explicit text messages from Smith's electronic devices and AS's phone. For example, consistent with

---

[9] The three child-pornography and enticement counts (Counts One, Two, and Three) were based on six nude photographs of AS that the police found on Smith's Motorola cellphone and the synched backup of his iPhone located on his Lenovo personal computer (10/20/21:69-73 (admitting Exh. 6 ("close-up picture of [AS's] vagina")); *id.* at 75-76 (admitting Exh. 9 ("photograph of [AS's] anus and [her] vagina")); *id.* at 97 (admitting Exhs. 31-48); *id.* at 100-01 (Exh. 37 ("picture with the focal point being on [AS's] vagina and anus")); *id.* at 102 (Exh. 39 ("close-up picture of [AS's] vagina with two fingers spreading it open")); *id.* at 102-03 (Exh. 41 ("close-up picture with a focal point being [AS's] vagina")); *id.* at 107 (Exh. 47 ("picture with a focal point being [AS's] vagina")); see generally 10/21/21:130-40 (AS identifying herself in nude photos); 10/26/21:157 ("Smith owned and controlled the Motorola"); Exh. 84 (T-Mobile subscriber records for Smith's Motorola cellphone)).

AS's testimony that Smith often directed her to retake the nude photos she sent him, Smith texted AS this:

> When u go in the bathroom u better give me better pics of that ass, pussy n tits tonight (Exh. 4; see 10/20/21:59-62 (admitting Exh. 4, texts recovered from synched backup of Smith's iPhone on his Lenovo computer); 10/21/21:100-02 (AS identifying Smith's texts)).

Similarly, consistent with AS's testimony that Smith routinely threatened her with anal sex, Smith texted AS these messages:

> I must be able to put my dk all the way into ur ass before I buy the shoes after I fuck ur ass good n com in ur ass u can get whatever you want as long as ur taking care my dk (Exh. 4).

> After u start letting me put my dk all the way into ur ass u can make him ur boyfriend (Exh. 24; see 10/20/21:165 (admitting Exh. 24, texts recovered from AS's phone); 10/21/21:95-99 (AS identifying Smith's texts)).

Moreover, consistent with AS's testimony that Smith forced her to perform oral sex on him, Smith texted AS these messages:

> U need to suck my dk tomorrow n show me how much u love me (Exh. 22; see 10/20/21:152-56 (admitting Exh. 22, texts recovered from AS's phone); 10/21/21:78-88 (AS identifying Smith's texts)).

> I want my dk sucked tonight n i will give u some money tomorrow (Exh. 23; see 10/20/21:157-61 (admitting Exh. 23, texts recovered from AS's phone); 10/21/21:88-93 (AS identifying Smith's texts)).

Consistent with AS's testimony that Smith often performed oral sex on her when AS's mother slept or left the apartment, Smith texted AS these messages:

> When mommy takes [AS's sister] to the bus can I eat (Exh. 23).

> Tonight after mommy go to sleep I'll eat my pussy (Exh. 23A; see 10/20/21:161-65 (admitting Exh. 23A, texts recovered from AS's phone); 10/21/21:93-95 (AS identifying Smith's texts)).

Finally, consistent with AS's testimony that Smith threatened to tell AS's mother if AS refused to do what Smith demanded, Smith texted AS this:

> Please help do the things I asked u to do n don't make mommy mad with u cause she's looking for a reason to hurt u n I'm not there to stop it n I really enjoyed u last night when [u]r period over I need u to do what I told u to do honey I will be back soon (Exh. 23).[10]

Smith's sexual abuse of AS finally ended almost a year after it began when, in April 2017, AS's mother left Smith following an argument (10/21/21:142-43). While thereafter staying with a friend, AS got "scared" when AS's mother told her that they would soon be returning to Smith's apartment (10/21/21:145). AS thus told her friend's sister that

---

[10] AS identified numerous other sexually explicit texts from Smith, which were admitted as Exhibits 4, 22, 23, 23A, and 24 (see generally 10/21/21:78-103).

"something bad was happening at [Smith's] apartment" (10/21/21:146). Upon revealing Smith's sexual abuse, AS "felt relieved" because it meant she "didn't have to go back to the apartment" (10/21/21:147).[11]

### *The Defense Case*

Smith testified that he never sent AS "sexual text messages," demanded "nude photographs," or sexually abused AS (10/26/21:43, 70; see *id.* at 84-85). Smith also claimed that, though they did not have permission to do so, his children would use his two cellphones (a Samsung and an iPhone) (*id.* at 53-54, 57-58). Further, Smith maintained, "[e]verybody in the household" had access to his personal computer (*id.* at 67). Finally, Smith claimed, *he* had forced AS's mother to leave his

---

[11] In addition to the other exhibits that corroborated AS's testimony – *e.g.*, Smith's numerous sexually explicit text messages (Exhs. 4, 22, 23, 23A, 24); the nude close-up photographs of AS's vagina and anus recovered from Smith's electronic devices (Exhs. 6, 9, 37, 39, 41, 47); AS's school records documenting her increased absences from May 2016 on (Exhs. 82A, B); and AS's mother's hospital records (Exh. 94) – the government introduced U-Haul rental records, which corroborated AS's description of the time when Smith forced her to perform oral sex on him in the front seat of a U-Haul (10/21/21:123-25; see Exhs. 79A-C). Further, law-enforcement personnel recovered "many" additional nude photos of AS from Smith's Motorola cellphone (10/21/21:247-55; 10/20/21:97; e.g., Exhs. 31, 33, 45 (topless photos), 43 (bare-buttocks photo)).

apartment because she had a "drug problem and wouldn't do anything about it" (*id.* at 80).[12]

## Summary of Argument

The district court correctly concluded that Smith failed to make out a prima facie case of a fair cross-section violation. Specifically, he failed to show Blacks were unreasonably and unfairly represented in the jury venires. He also failed to show that, even if Blacks were underrepresented, this was due to systematic exclusion as opposed to an external factor, *i.e.*, low response rates to juror summons.

The district court also correctly declined to suppress the cellphones and personal computer recovered from Smith's apartment. Contrary to Smith's contention, the search warrant was sufficiently particular. It

---

[12] To establish Smith's dominion over the Motorola cellphone (202-569-1143), in the government's rebuttal case FBI Agent Danielle Schnur explained that her investigation determined "Smith owned and controlled the Motorola" (10/26/21:157-69; see also Exhs. 116, 117 (text messages between the Motorola and Smith's wife); Exhs. 118, 119 (text messages between the Motorola and Smith's daughter (Ella)); Exhs. 120, 121 (text messages between the Motorola and Smith's stepdaughter (AS)).

appropriately constrained the search to evidence of a specific crime, namely, child sexual abuse pursuant to D.C. Code § 22-3008.

Additionally, the district court did not abuse its discretion in declining to exclude the government's case agent from the courtroom. Fed. R. Evid. 615(b) expressly exempts from exclusion the designated representative of a party – such as the United States – that is not a natural person. Because the government designated FBI Agent Danielle Schnur as its representative before trial, the district court properly denied Smith's motion to exclude her.

Finally, the district court did not err – let alone plainly err – in permitting Agent Schnur to opine about the origins of certain text messages between Smith and AS. After Smith complained that the government had not laid a foundation for Agent Schnur's expert testimony, the prosecutor did so and Smith did not thereafter challenge Agent Schnur's expertise. Accordingly, her testimony was properly admitted pursuant to Fed. R. Evid. 702.

## ARGUMENT

## I.    The District Court Properly Rejected Smith's Claim that his Jury Was Not Drawn from a Fair Cross-Section of the Community.

Though Smith maintains (at 10-20) he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community, he is mistaken.

### A.    Applicable Legal Principles and Standard of Review

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *see United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997). "To establish a prima facie violation of the fair-cross-section requirement," Smith had to "prove that: (1) a group qualifying as 'distinctive'; (2) [wa]s not fairly and reasonably represented in jury venires; and (3) 'systematic exclusion' in the jury-selection process account[ed] for the underrepresentation." *Berghuis*, 559 U.S. at 327 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Though this Court has not identified the applicable standard of review, *see DeFries*, 129 F.3d at 1299, 1301,

13

other courts review such claims de novo. *See United States v. Savage*, 970 F.3d 217, 254 n.30 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 481 (2021); *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1158 (9th Cir. 2014) (en banc).

## B.     Relevant Procedural History

Pursuant to the Jury Selection and Service Act (JSSA), 28 U.S.C. §§ 1861 *et seq.*, the District of Columbia District Court has adopted a Jury Selection Plan designed to "have grand and petit juries selected at random from a fair cross section of the community." *Id.* § 1861. Chief Judge Howell summarized the Plan's "critical phases" (along with relevant information from Smith's case) as follows:

> Every four years, data is obtained from voter-registration records, the Department of Motor Vehicles, and taxpayer records and these three sources are merged – with duplicate names excised – into the Source List;

> A random subset of 600,000 entries from the Source List is thereafter selected, yielding the master jury wheel, "on which certain list maintenance activities are periodically performed";

> "On a rolling basis corresponding to two-week windows of potential trial start dates, the Jury Office sends out summonses and questionnaires to a group of around 1,800-2,000 randomly selected persons – the 'summons list' (here, 1,837 entries) – from the master jury wheel";

Out of those issued summons, "some fraction of the questionnaires are completed and returned to the Jury Office, forming the group of 'respondents'" (here, 697 persons); and

Finally, the Jury Office "processes disqualifications, exemptions, and excuse requests presented by respondents, with the group of remaining respondents called the 'qualified two-week jury pool'" (here, 309 persons). (JA246.)[13]

Hours before jury selection, Smith moved to dismiss his indictment, alleging a constitutional and statutory violation in the venire composition (JA141-48). Though conceding that the district court's Jury Selection Plan "was carefully calibrated to produce a fair cross-section of the community," Smith "fear[ed]" his trial venire's racial composition would be skewed by disproportionate impacts of the COVID-19 pandemic on minority communities and the ensuing adverse effects on jury-summons response rates (JA145-47). Because Smith had failed to include the statutorily mandated "sworn statement of facts" with his motion, however, he supplemented it two days later with a declaration from Dr. Richard Seltzer (a Howard University Professor of Political Science)

---

[13] For a more detailed description of the district court's Jury Selection Plan, see Judge Howell's opinion at JA240-48.

(JA159-61; *see* 28 U.S.C. § 1867(d)).[14] Dr. Seltzer opined that the proportion of Black prospective jurors shown on the Jury Office's lists fell short of the adult Black share of the District of Columbia's population by over "ten percentage points" (JA161). In opposing Smith's motion, the government offered a 19-page declaration from Dr. Bernard Siskin (a Director at BLDS, LLC, a specialty consulting firm) (ECF #172-1). Dr. Siskin did not dispute that Blacks were underrepresented in the pools specific to Smith's trial but concluded this was almost entirely attributable to racial differences in response rates to the jury summons (*id.* at ¶¶ 31-32).

The district court found Smith failed "to make the prima facie showing necessary to prevail on a Sixth Amendment fair cross section challenge," concluding he did not show: (a) Blacks were unfairly and

---

[14] Given Smith's failure to adhere to the statutory pleading requirements, he agreed that he was not seeking to delay his trial but was simply "preserv[ing]" his underrepresentation claim (10/18/21:28-29). Following his trial, Smith supplemented his motion with an additional declaration from Dr. Seltzer (ECF #174-2; see JA282-83 n.40), and the district court thereafter denied Smith's constitutional and statutory claims (JA239-312 (dated: Feb. 11, 2022)).

unreasonably represented; or (b) systematic exclusion (JA276, 278-301).[15]

Though Smith had shown "a degree" of Black underrepresentation in jury pools, the court found that insufficient "to satisfy *Duren*'s second prong" (JA285-86). Employing the absolute- and comparative-disparity methods of comparison,[16] the court calculated this degree of underrepresentation as follows: First, the parties' experts "agree[d]," the Black share of the District's adult population, as found by the 2020 Census, is 39.3% (JA281). Second, recognizing that fair cross-section

---

[15] The court found *Duren*'s first prong "easily met" because Blacks are a distinctive group (JA277-78). Though Smith's motion had "repeatedly mention[ed] Black and Hispanic residents," he did not furnish any empirical analysis concerning the latter (JA277). Accordingly, the district court considered only Black representation (JA277-78), a ruling Smith does not challenge on appeal. The court also rejected Smith's JSSA claim, a ruling Smith also does not challenge "except" to the extent the statutory analysis "overlaps with the Sixth Amendment analysis" (at 4 n.3).

[16] The absolute-disparity test "examines 'the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool'" by subtracting the jury-pool percentage from the Census-determined population percentage. *Hernandez-Estrada*, 749 F.3d at 1160 (citation omitted). Comparative disparity, in contrast, "is calculated 'by taking the absolute disparity percentage and dividing it by the percentage of the distinctive group in the total population.'" *Id.* As the district court noted, although this Court has not "opined on the matter," the other circuits have "coalesced principally" around these two tests (JA279).

violations are "not identified by examining a single jury, a single venire, or a single draw of persons to be summoned from a master jury wheel," the court aggregated seven two-week jury pools from 2021 (including Smith's two-week jury pool), which resulted in a 28.6% percentage of Black representation (JA282, 284).[17] Applying the absolute-disparity test, the district court found the representation of Blacks in the jury pool "lagged the Census-estimated share of Blacks in the adult population of the District by at least 10.7 percentage points" (39.3% - 28.6% = 10.7%) (JA278; *see* note 16 *supra*). Alternatively, the court calculated a comparative disparity of 27.2% (10.7% divided by 39.3%), which meant, at the time of Smith's trial Blacks were 27.2% less likely to be in a two-week jury pool than if the representation was directly proportional to their population in the District (JA284-85; *see* note 16 *supra*). In either

---

[17] Smith's expert, the court noted, had "[i]nexplicably" omitted from his analysis *the very two-week pool at issue in [Smith's] motion*, that from which [Smith's] venire was drawn – a pool consisting of 309 persons, of whom 24.9% were Black, derived from a set of 1,837 summons originally sent on August 25, 2021" (JA283). This omission was even more inexplicable because "all" six of the *other* 2021 pools included in Dr. Seltzer's analysis "exceeded the 24.9% Black representation in [Smith's] qualified two-week pool" (JA284). Thus, including Smith's two-week jury pool in the aggregate percentage actually *reduced* (from 29.2% to 28.6%) the average Black representation (JA284).

case, the district court concluded, the disparity was "in a range that courts have generally deemed insufficient for a Sixth Amendment violation under the *Duren* test" (JA286; *see also* JA284-85 (citing, "e.g.," *United States v. Quiroz*, 137 Fed. App'x 667, 670 (5th Cir. 2005); *United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir.1995); *Savage*, 970 F.3d at 257)).

The district court alternatively concluded that Smith failed to meet *Duren*'s third prong, which requires a showing that the underrepresentation of Blacks was due to their systematic exclusion from the jury-selection process (JA286-97). Though Smith had posited that the underrepresentation of Blacks was attributable to "disproportionately low Black response rates to jury summonses driven by the COVID-19 pandemic," any such non-responses "'are not a problem "inherent" to the jury selection procedures, but are the result of individual choice'" (JA286, 289 (citation omitted)).[18]

---

[18] Below, Smith also suggested that the "discretion exercised by the jury office to excuse jurors" and certain master-jury-wheel defects could have led to Black underrepresentation (ECF #174, at 6; ECF #180-2, at 5-6). Smith does not repeat these claims and thus has abandoned them. In any event, the district court properly rejected these contentions, noting the "data" belied Smith's "contention that the granting or denial of

(continued . . . )

Accordingly, the district held, although Smith had "successfully demonstrate[d] that, at least during the pandemic, Black petit jury pool representation, in particular, f[ell] short of full proportionality with the census-confirmed demographics of the community," the "factual support" he adduced did "not provide sufficient reason to dismiss [his] indictment or provide relief from his validly rendered conviction" (JA239-40).[19]

---

discretionary excuses has meaningfully affected the racial composition of the qualified jury pool" (JA298). Further, though recognizing that "the master wheel in effect at the time relevant to [Smith's] jury selection was oversized and bore many duplicate entries" – defects attributable to a "programming error" that caused taxpayer records to be omitted "at the time the master wheel was first deployed on December 14, 2020," and a "well-meaning but ill-fated attempt to mitigate" this error "by importing the entirety of the taxpayer records atop the then-existing wheel, without deduplication" – the court found that the "now-resolved defects in the master wheel did not compromise the fair cross section objective of the Plan in any material way" (JA299-300). As the government's expert determined, "the overall deduplication failure resulted in a diminution of overall Black representation of 0.62 percentage points – far below" the commonly recognized absolute-disparity threshold of 10% (JA300-01).

[19] As the district court noted, though the JSSA permitted Smith to ask the court either to dismiss his indictment or to stay the proceedings, he only asked the court to dismiss his indictment (JA271; see note 14 *supra*). But the court correctly found that such a remedy was "entirely unmoored from the problem he allege[d]: the purported infeasibility, during the pandemic, of drawing a *petit jury* venire from a fair cross section of the community" (JA274 (emphasis added)). This discrepancy, the court noted, "alone" was "sufficient reason to deny [Smith's] motion" (JA274). Nonetheless, as explained, the court carefully considered the merits of Smith's motion.

### C. Considering Both Absolute- and Comparative-Disparity Percentages, the District Court Correctly Concluded that Smith Failed To Show Unfair and Unreasonable Representation.

No Supreme Court decision "specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Berghuis*, 559 U.S. at 1394. Thus, "in order to obtain the most accurate picture possible," *United States v. Weaver*, 267 F.3d 231, 242 (3d Cir. 2001), courts "generally rely" on both the absolute- and the comparative-disparity methods of comparison, *United States v. Shinault*, 147 F.3d 1266, 1272 (10th Cir. 1998). "[W]hen applied together, one method can be reasonably expected to offset the shortcomings of the other." *Savage*, 970 F.3d at 257.

Consistent with this cautious approach the district court considered the results of both the absolute- and comparative-disparity tests and reasonably concluded those percentages failed to satisfy *Duren*'s second prong. The 10.7% absolute disparity, the court found, is "close to, or even below, levels that some other courts applying [that] test have rejected as insufficient to show underrepresentation" (JA284 (citing authorities)).

Similarly, the 27.2% comparative disparity is a "value below those generally found to be significant" (JA284-85 (citing authorities)).

Smith fails to show that the district court erred. "[N]umerous courts have noted that an absolute disparity below 10% generally will not reflect unfair and unreasonable representation." *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 (3d Cir.) (citing authorities from First, Ninth, and Tenth Circuits), *cert. denied*, 141 S. Ct. 275 (2020).[20] And, while the 10.7% absolute disparity here exceeds 10%, it does so only slightly. Moreover, the 27.2% comparative-disparity figure is not close to those "deemed *in*sufficient in other cases." *Savage*, 970 F.3d at 258 (emphasis added) (comparative disparity of 50.24%; population percentage of 16.82%); *see also Howell*, 939 F.3d at 268 (comparative disparity of 54.49%; population percentage of 10.7%); *United States v. Orange*, 447 F.3d 792, 796, 798-99 (10th Cir. 2006) (comparative

---

[20] *See also United States v. Davis*, 854 F.3d 1276, 1295 (11th Cir. 2017) ("Under Eleventh Circuit precedent, '[i]f the absolute disparity . . . is ten percent or less, the second element is not satisfied.'"); *United States v. Garcia*, 121 F.3d 704 (5th Cir. 1997) (unpublished) ("many other courts have similarly held that an absolute disparity of less than 10% alone is not enough to demonstrate underrepresentation") (citing authorities from First, Seventh, and Eleventh Circuits).

disparities "rang[ing] from 38.17% to 51.22%"; population percentages ranging from 1.64% to 8.63%); *United States v. Chanthadara*, 230 F.3d 1237, 1256-57 (10th Cir. 2000) (comparative disparities of 40.89% and 58.39%; population percentages of 7.9% and 2.74%, respectively); *United States v. Clifford*, 640 F.2d 150, 155-56 (8th Cir. 1981) (comparative disparity of 46%; population percentage of 15.6%).

Smith claims (at 14-15) that the "out of jurisdiction," absolute-disparity cases relied upon by the district court "erroneously import an equal protection disparity threshold into the fair cross section issue" (citing *Grisham* and *Quiroz*). For a number of reasons, this claim fails.

First, as explained *supra*, in *Howell* the Third Circuit identified decisions from three circuits other than the Fifth and Eleventh that similarly recognize a 10% absolute-disparity threshold. So, even assuming *Grisham* and *Quiroz* improperly imported equal-protection standards into their fair-cross-section analyses, but see *infra*, at least four other circuits (the First, Third, Ninth, and Tenth) apparently recognize the same threshold. *See generally* Wright & Miller, *Federal Practice and Procedure* § 376 (4th ed. 2022) ("courts have generally found that a difference of less than 10% under the absolute disparity method

means that the second prong of the *Duren* test for a Sixth Amendment violation has not been met").

Second, in concluding that Smith had failed to make a showing "sufficient to satisfy *Duren*'s second prong" (JA285), the district court did not rely solely on an absolute-disparity measure. Rather, the court additionally considered the 27.2% comparative disparity, noting that was a "value below those generally found to be significant" (JA284-85 (citing *Savage*, 970 F.3d at 258, which, in turn, cites authorities from the Third and Tenth Circuits)).[21] Thus, again, even accepting that the 10% *absolute*-disparity threshold endorsed by the Fifth and Eleventh Circuits is somehow "incorrect," as Smith maintains (at 15), he has alternatively failed to show a "significant" *comparative* disparity (JA285).

Finally, contrary to Smith's contention, courts and commentators have recognized that the "prima facie tests for an equal protection claim

---

[21] Though Smith chides (at 14) the district court for relying on "cases from other jurisdictions," this Court has considered few fair cross-section challenges. And, other than *DeFries*, which had no occasion to consider disparity percentages, none of those decisions required substantive analysis of underrepresentation. *See United States v. Walker*, 545 F.3d 1081, 1089 (D.C. Cir. 2008); *United States v. Bryant*, 523 F.3d 349, 361-62 (D.C. Cir. 2008); *United States v. Spriggs*, 102 F.3d 1245, 1253-54 (D.C. Cir. 1996).

and a fair cross-section claim are virtually identical." *United States v. Davis*, 854 F.3d 1276, 1295 (11th Cir. 2017); *see also United States v. Mitchell*, 502 F.3d 931, 952 (9th Cir. 2007) ("equal protection challenge is somewhat similar to a Sixth Amendment fair cross-section challenge").[22] Indeed, implicitly recognizing the two tests' substantive identity, this Court has deployed the Supreme Court's equal protection standard when rejecting fair cross-section claims: "[B]ecause appellants have not produced evidence that would demonstrate . . . a *substantial underrepresentation* as would violate their Sixth Amendment right, their jury venire contentions fail." *DeFries*, 129 F.3d at 1301 (emphasis added); *cf. Castaneda*, 430 U.S. at 494 ("[I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in

---

[22] *See also* J. Heyman, *Introducing the Jury Exception: How Equal Protection Treats Juries Differently*, 69 N.Y.U. Ann. Surv. Am. L. 185, 245 (2013) (fair cross-section test "functionally identical" to Equal Protection test "laid out" in *Castaneda v. Partida*, 430 U.S. 482 (1977)); S. Chhablani, *ReFraming the Fair Cross-Section Requirement*, 13 U. Pa. J. Const. L. 931, 947 (2011) ("As the *Duren* opinion lays bare, the cross-section test borrowed heavily from the court's Equal Protection Clause doctrine."); A. Leopold, *Constitutionalizing Jury Selection in Criminal Cases: A Critical Evaluation*, 86 Geo. L.J. 945, 972 (1998) ("the cross-section and equal protection cases significantly overlap").

*substantial underrepresentation* of his race or of the identifiable group to which he belongs.") (emphasis added).[23]

### D. The District Court Correctly Concluded that Smith also Failed To Show Systematic Exclusion.

Alternatively, as the district court rightly determined, Smith failed to make out a prima facie Sixth Amendment violation because he failed to show that any underrepresentation was "due to the *system* by which juries were selected," *Duren,* 439 U.S. at 367. Though Smith speculated that low – pandemic-driven – Black response rates were a cause for any underrepresentation, even if they were, the district court accurately observed, "every individual's choice of whether or not to respond to the summons is a prototypical 'external force' that generally cannot sustain a claim of systematic exclusion" (JA294).

"There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." *United*

---

[23] We do not suggest that Smith must show a "discriminatory purpose" in the operation of the jury system, as is required to prove a violation of the Equal Protection Clause. *See Castaneda*, 430 U.S. at 493 (substantial underrepresentation violates Equal Protection Clause "if it results from *purposeful* discrimination") (emphasis added).

*States v. Rioux*, 97 F.3d 648, 658 (2d Cir. 1996). "Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*." *Orange*, 447 F.3d at 800. Thus, "the choices of individual prospective jurors not to respond to their summons or not to appear for service" are "external factors" that do not reflect "systematic exclusion." *Israel v. United States*, 109 A.3d 594, 604-05 (D.C. 2014).[24]

---

[24] *Accord Bates v. United States*, 473 Fed. App'x 446, 451 (6th Cir. 2012) ("Non-responses . . . are not a problem 'inherent' to the jury selection procedures, but are the result of individual choice."); *Orange*, 447 F.3d at 800 (fact that "minority population was less likely to return the juror questionnaires" did not "constitute systematic exclusion"); *United States v. Murphy*, 1996 WL 341444, *5 (N.D. Ill. June 18, 1996) ("The jury selection system for the Eastern Division is not excluding African-Americans as a group, but many African-American individuals are excluding themselves by not responding to jury questionnaires."); *United States v. Ortiz*, 897 F. Supp. 199, 205 (E.D. Pa. 1995) ("We find no systematic exclusion of Hispanics. . . . Rather, it was the unfortunate failure of Hispanics either to register to vote or to return the jury questionnaires, through no fault or encouragement of the court's jury selection procedures, which may have produced any underrepresentation[.]"); *United States v. Guzman*, 454 N.Y.S.2d 852, 863 (N.Y. App. Div. 1982) ("The fact that Hispanics do not respond to summons to qualify in proportion to their representation within the community cannot be viewed as an inherent defect in the selection process sufficient to constitute a showing of systematic exclusion.").

Smith does not dispute that non-responses constitute external forces but contends (at 19) the Sixth Amendment "impose[s] an affirmative duty" on the jury office to "follow up and/or enforce" such non-responses. "Courts, however, have been relatively uniform in finding that the failure to send additional letters to individuals who did not respond to questionnaires was not 'systematic exclusion' within the meaning of *Duren*." *Smith v. Berghuis*, 543 F.3d 326, 341 n.5 (6th Cir. 2008) (citing authorities from Second, Ninth, and Tenth Circuits), *rev'd on other grds*, *Berghuis v. Smith*, 559 U.S. 314 (2010). Not only are such affirmative measures not "constitutionally required," but "such a targeting might well be objectionable 'since it would undermine the randomness of jury selection that is keenly desired.'" *Israel*, 109 A.3d at 605 (quoting *Rioux*, 97 F.3d at 659); *see also Guzman*, 545 N.Y. S.2d at 863 ("Additionally, we cannot accept defendant's proposal that affirmative action, in the form of, *inter alia,* sending out 'summons to additional numbers of Hispanics' should be undertaken in an attempt to secure a greater response from the Hispanic members of the community. Such a remedy would serve to abrogate this State's interest in a random, race-blind selection

process.").[25] Thus, Smith failed to satisfy *Duren*'s third requirement that the system "caused," rather than merely coexisted with, the underrepresentation. 439 U.S. at 366. Indeed, to hold otherwise would effectively eliminate the third *Duren* requirement entirely, by finding that wherever underrepresentation exists, the system must inevitably be its cause, either directly, as in *Duren*, or indirectly, *e.g.*, by "failing" to act affirmatively to counteract underrepresentation resulting from outside forces.

## II.  The District Court Properly Declined to Suppress Smith's Cellphones and Computer.

Next, Smith claims (at 20-29), the district court erroneously denied his suppression motion because, he asserts, the 2017 "warrant was

---

[25] Smith cites no relevant fair cross-section case law in support of his novel contention. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers"). Instead, his principal authority (at 17) is a law review article, which, in contravention of *Duren*, advocates for "an explicit balancing test, where courts can evaluate whether the government has made a good-faith effort to satisfy the defendant's fair cross-section right in light of the competing rights, responsibilities, and practical realities." N. Chernoff, *Black to the Future: The State-Action Doctrine and the White Jury*, 58 Washburn L.J. 103, 184 (2019).

insufficiently particular as to the items to be seized and overbroad in scope" (initial capitalization omitted). Again, Smith is mistaken.

## A.   Relevant Procedural History

On April 21, 2017, Detective Jenny Alvarenga – an eight-year MPD veteran whose responsibilities included "investigat[ing] sexual and physical abuse crimes" against children – applied for a warrant to search Smith's apartment for "[e]vidence of an offense IN VIOLATION of DC CODE [§] 22-3008," which prohibits First-Degree Child Sexual Abuse (JA62, 64). In support of her application, Detective Alvarenga executed an affidavit establishing probable cause to believe that Smith had sexually abused AS and that evidence of that abuse would be found in his apartment (JA63-65).

As to Smith's sexual abuse of AS, Detective Alvarenga swore that, just two days before, on April 19, 2017, then-13-year-old AS had told her mother that Smith "forced her on several occasions to perform oral sex on him and he ha[d] been performing oral sex on her, since May of 2016" (JA63). Further, on that same day, AS had disclosed to a Children's Advocacy Center (CAC) interviewer that Smith first "began forcing her to perform oral sex on him in May of 2016," a date she recalled because

30

"it was before her birthday and as a birthday present [Smith] bought her a cellular phone" (JA63). AS also told the CAC interviewer that, in 2017, Smith "began 'connecting his mouth to [AS's] vagina" (JA64).

Detective Alvarenga's affidavit also detailed why there was probable cause to believe that evidence of Smith's sexual abuse of AS would be found on their electronic devices. AS told the CAC interviewer that, "at night after sexually abusing her, [Smith] would send text messages to her cellular phone which would contain long paragraphs about the 'next schedule,'" which meant Smith's "expectations of their next sexual encounter" (JA64). AS further indicated that "she would send [Smith] nude pictures of herself at his request" and, on "a few occasions," Smith "took pictures of her naked body with his cellphone" (JA64). AS also disclosed that she had seen Smith "connecting his cellular phone to a computer located in his bedroom" (JA64). AS's reports were consistent with Detective Alvarenga's experience that sex offenders "like to take pictures of their victims" and "will often store these images in their personal computers" (JA65). Finally, Detective Alvarenga explained, there was probable cause to believe Smith's apartment contained not only his electronic devices, but also AS's and AS's mother's: "Prior to them

leaving [Smith] took both [AS's] and her mother's cellular phones" (JA63).

Based on Detective Alvarenga's sworn affidavit, on April 21, 2017, a D.C. Superior Court judge authorized law enforcement to search Smith's apartment (JA62). The warrant declared there was probable cause to believe those premises "concealed certain property, namely [c]ellular phones, computers, digital storage devices, thumb drives, removable electronic devices such as external hard drives, . . . mail matter, any material identifying any resident of the house . . . and any items or material relating to the offense of First Degree Child Sexual Abuse[,] which is [e]vidence of an offense IN VIOLATION of DC CODE 22-3008" (JA62).

On that same day (April 21), at 5:25 pm, law-enforcement officers executed the search warrant at Smith's apartment (JA62). There, they found, among other things, a Lenovo personal computer, a Motorola cellphone, an Apple iPhone 6S, three tablets, and ten additional cellphones (JA62, 104).[26]

---

[26] In 2019, law-enforcement officials secured a second warrant, which permitted them to use "newer forensic tools" to extract data from two

(continued . . . )

Smith moved to suppress this evidence (JA44-60). The district court denied Smith's motion, finding "the affidavit provided ample grounds to believe that [Smith] committed First Degree Child Sexual Abuse" and that "evidence of this sexual abuse would be located on various electronic devices, including" Smith's Motorola cellphone, his Lenovo computer, and AS's iPhone (JA112-13).[27] Additionally, the court determined, the warrant was "sufficiently particular and not overbroad in permitting law enforcement to search all of the data on the seized electronic devices for evidence" of child sexual abuse (JA123). Finally, the court concluded, "even if" the warrant "were deficient in some way," it was not "so facially deficient as to warrant suppression" or "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'" (JA126-27 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984))).[28]

---

phones originally seized in 2017: Smith's Motorola cellphone and AS's iPhone (JA105).

[27] Though Smith contended below that Detective Alvarenga's affidavit lacked probable cause, and asked for a hearing (JA44, 48-49), he does not repeat those arguments on appeal.

[28] The court also concluded that, "[e]ven if the 2017 warrant were insufficiently particular with respect to the authorization to extract all data from the devices, the 2019 warrant would have cured any deficiencies and supported the seizure of data" from AS's iPhone and

(continued . . . )

## B.    Standard of Review

"In reviewing the denial of a motion to suppress, [this Court] examine[s] the district court's legal conclusions de novo, but appl[ies] a 'clearly erroneous' standard to its underlying findings of fact." *United States v. Pindell*, 336 F.3d 1049, 1052 (D.C. Cir. 2003); *see also United States v. Wong*, 334 F.3d 831, 836 (9th Cir. 2003) ("The standard of review for the specificity of a warrant is de novo."); *United States v. King*, 227 F.3d 732, 750 (6th Cir. 2000) (same).

## C.    The District Court Correctly Concluded the Warrant Was Sufficiently Particular.

Smith asserts (at 9) the "2017 search warrant issued by a Superior Court judge that contained a single paragraph broadly describing the things to be seized was insufficiently particular and overbroad." Contrary to Smith's contention, however, the district court correctly concluded that

---

Smith's Motorola cellphone (JA124-25). "[T]he 2019 warrant provided a detailed list of examples of data or information to be seized," and there was "no reason to believe that the earlier extraction [based on the 2017 warrant] played any role in providing the probable cause for the 2019 seizure": the 2019 warrant "mentions only the *fact* of the earlier extractions, not the content of the extractions" (JA125).

the warrant particularly described the items to be seized and was not overbroad.

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of a warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *accord United States v. Dale*, 991 F.2d 819, 846 (D.C. Cir. 1993). "By limiting the authorization to search to specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, 480 U.S. at 84.

Warrants authorizing a search for evidence relating to a specific criminal activity are sufficiently particular. Here, the warrant authorized law-enforcement personnel to search only for items that were "[e]vidence of an offense IN VIOLATION of DC CODE 22-3008," *e.g.*, First-Degree Child Sexual Abuse (JA62). Unlike a "reference to a broad federal statute, such as the federal wire fraud statute," *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990), the warrant's reference to

D.C.'s child-sex-abuse offense limited its scope sufficiently to satisfy the particularity requirement. *See Dale*, 991 F.2d at 847-48 (warrant sufficiently particular where "common-sense reading" of it was that "the government could seize a variety of specifically identified documents and any other records that related to the product substitution and tax evasion allegations made in [the agent's] affidavit").[29]

Smith does not dispute that a "warrant's reference to a particular statute" may "limit the scope of the warrant sufficiently to satisfy the particularity requirement." *Maxwell*, 920 F.2d at 1033. Nor does he suggest that D.C. Code § 22-3008 is such a "broad statute[ ]" that it "realistically constitute[d] no limitation at all on the scope" of the

---

[29] *Accord United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018) ("A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime."); *United States v. Burke*, 633 F.3d 984, 992 (10th Cir. 2011) ("[T]he warrant was sufficiently particular. The third paragraph begins with 'due to the nature of the charges,' and the charge listed on the warrant is the sexual exploitation of a child followed by a statutory reference, a charge 'narrow enough to meet the fourth amendment's requirement' by bringing to the officers' attention the purpose of the search.") (citations omitted); *United States v. Hay*, 231 F.3d 630, 638 (9th Cir. 2000) ("[I]n this case, the application did not ask for, and the warrant did not authorize, seizure of every document, but of child pornography which is a sufficiently specific definition to focus the search.").

warrant. *Maxwell*, 920 F.2d at 1033. Instead, Smith claims (at 24-25), the warrant's statutory reference "modifie[d] only the *last* catch-all category" (*e.g.*, "items or materials"), not "the preceding categories" of property (*e.g.*, "[c]ellular phones," "computers," and "thumb drives") (emphasis added). Contrary to Smith's claim, however, the phrase "which is [e]vidence of an offense IN VIOLATION of DC CODE 22-3008" modified *all* the categories of evidence that preceded it (JA62). The preprinted warrant form used by Detective Alvarenga provides a multi-line blank space for a description of the "property" "concealed" on the premises (JA62). In this space, Detective Alvarenga listed several tangible items, including cellphones and computers (JA62). Immediately following this multi-line space for a "property" list, the warrant form introduces another blank space with the preprinted phrase "which is," thus plainly indicating that anything written in this second space – here: "[e]vidence of an offense IN VIOLATION of DC CODE 22-3008" – modifies the entire list of "property" that precedes it (see JA62). Accordingly, as the district court properly concluded, "the warrant was sufficiently particular because it was confined to evidence of a 'narrowly defined statute that sufficiently limit[ed] the scope of the search'" (JA117). *See generally United States v.*

*Vaughn,* 830 F.2d 1185, 1186 (D.C. Cir.1987) ("'It is sufficient if the warrant signed by the judicial officer is particular enough if read with reasonable effort by the officer executing the warrant.'") (citation omitted); *United States v. Gendron*, 18 F.3d 955, 966 (1st Cir. 1994) ("descriptions in warrants (and in their supporting documents)" are to be read in a "'commonsense' fashion," not "'hypertechnical[ly]'") (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Citing *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017), Smith also asserts (at 21-23) the warrant was insufficiently particular because it did not specify the "make or model" of the phones he and AS used. *Griffith*, however, has no application here. In concluding the warrant in that case was overbroad "in allowing the seizure of all electronic devices" found in Griffith's residence, this Court emphasized that the "'requirement of particularity is closely tied to the requirement of probable cause.'" 867 F.3d at 1275 (citation omitted). And, although the warrant in *Griffith* authorized the seizure of "'all electronic devices,'" the affidavit "failed to establish probable cause to suspect that any cellphones or other electronic devices belonging to Griffith and containing incriminating evidence would be found in the apartment." *Id.* at 1276.

Indeed, the affidavit conveyed "no reason" to think that Griffith even "owned a cellphone." *Id.* at 1272. Moreover, the "warrant did not stop with any devices owned by Griffith" but "broadly authorized seizure of *all* cellphones and electronic devices, without regard to ownership." *Id.* at 1276.

In contrast to the *Griffith* affidavit, Detective Alvarenga's affidavit provided ample probable cause to believe: (a) Smith owned a phone that he had used to facilitate his sexual abuse of AS; and (b) other phones in his apartment either contained evidence of that abuse (AS's) or likely corroborated AS's description of it (AS's mother's). Thus, consistent with *Griffith*'s admonition, the warrant was "tailored to the justifications for entering the home" because it "limited the scope of permissible seizure to . . . devices *linked* to the [sexual abuse]." 867 F.3d at 1276 (emphasis added). Specifically, the warrant only authorized the seizure of those electronic devices constituting "[e]vidence of an offense IN VIOLATION of DC CODE 22-3008" (JA62).

Finally, Smith contends (at 25-26), the warrant was deficient because it failed to "specify any type or category of evidence to be seized from the electronic devices." "Federal courts, however, have 'rejected

most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers' because 'criminals can – and often do – hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the computer may be required.'" *United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015) (citation omitted). Here, the officers were authorized to search for evidence of child sexual abuse on Smith's electronic devices but, at the time of the seizure, they "could not have known where the information was located in [those devices] or in what format." *Id.* at 1050. Accordingly, an expansive search of Smith's electronic devices was necessary and appropriate. *See*, *e.g.*, *United States v. Wagner*, 951 F.3d 1232, 1247 (10th Cir. 2020) ("We have held that when a warrant for child pornography evidence 'as a whole' limits the agents' search to evidence related to child pornography, the warrant is not overbroad for failure to expressly require that each individual category of items for seizure pertain to child pornography."); *United States v. Stabile*, 633 F.3d 219, 239 (3d Cir. 2011) ("criminals can easily alter file names and file extensions to conceal

contraband"); *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010)

("computer files may be manipulated to hide their true contents").[30]

### D. Alternatively, the District Court Properly Found, the Good-Faith Exception Precluded Suppression of Smith's Phones and Computer.

As the district court correctly determined, even if the warrant was insufficiently particular, the good-faith exception applied.

"[T]he exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate." *Maxwell*, 920 F.2d at 1034 (quoting *Leon*, 468 U.S. at 987-88). Here, Detective Alvarenga properly prepared an affidavit detailing the illegalities of which Smith was suspected and presented it to a neutral and detached

---

[30] In any event, as the district court properly concluded, "[e]ven if the 2017 warrant were insufficiently particular with respect to the authorization to extract all data from the devices," the 2019 warrant "cured" any such deficiency and "supported the seizure of data" from AS's iPhone and Smith's Motorola cellphone (JA124; see notes 26, 28 *supra*). And, the vast majority of the explicit photographs and text messages were found on those two devices, not Smith's Lenovo computer (see Exhs. 22, 23, 23A, 24 (texts); Exhs. 35, 37, 39, 41, 47 (close-up photos of AS's vagina and anus)).

Superior Court judge. Among other things, Detective Alvarenga included AS's first-hand descriptions of Smith's sexual abuse, which provided ample probable cause. Similarly, Detective Alvarenga included AS's descriptions of how Smith used his cellphone both to text AS about the abuse and to take nude photos of her (which he then apparently downloaded to his computer). The Superior Court judge thus determined that probable cause existed to search Smith's apartment for evidence of the suspected child sexual abuse. Further, the warrant carefully described the premises to be searched (1301 C Street Southeast #32, Washington, D.C.), the kinds of devices from which data was to be extracted (cellphones, computers, digital storage devices, thumb drives, etc.), and "indicated that only evidence of First Degree Child Sexual Abuse was to be seized" (JA127). In sum, Detective Alvarenga "took every step that could reasonably be expected of [her]," *Massachusetts v. Shepard*, 468 U.S. 981, 989 (1984), and reasonably relied on the judge's approval of her warrant. *See Maxwell*, 920 F.2d at 1034 ("Although we conclude that the warrant was overly broad, we nonetheless decline to order the suppression of the evidence seized pursuant to it because we

believe that the agents in this case reasonably relied on the warrant in good faith.").

Smith, however, claims (at 27-28) the good-faith exception does not apply because the "face of the warrant" did "not particularly describe the place to be searched," contending there "was no unit within 1301 C Street, S.E., labeled #32." This contention is meritless. The warrant specifically identified the apartment to be searched: "#32" (JA62). Moreover, although that apartment did "not have a visible number on it," Detective Alvarenga's affidavit established probable cause to believe that Smith's "home address" was Apartment 32 and that the "door to the left" of "apartment #31" was Smith's (*i.e.*, Apartment #32) (JA63-64). Specifically, the "numbers on the apartments [we]re numbered left to right" and Apartment 22 (on the second floor) was "located directly underneath the unlabeled door next to #31" (JA63). In these circumstances, Detective Alvarenga was entitled to rely on the Superior Court judge's determination that sufficient probable cause existed to identify the location of Smith's apartment. *See United States v. Spencer*, 530 F.3d 1003, 1006 (D.C. Cir. 2008) ("'In the ordinary case, an officer

cannot be expected to question the magistrate's probable-cause determination[.]'") (citation omitted).

Smith also asserts (at 28-29) the "warrant lacked probable cause to believe that [his] cellphone would be found in his home" because it "authorized execution at 'any hour of the day or night'" and "was executed at 5:26 pm on Thursday, April 21, 2017, when [he] was not likely to be and was not home." "Because of th[is] deficienc[y]," Smith claims (at 29), "executing officers could not reasonably presume the warrant to be valid." This claim is also meritless. Pursuant to the good-faith exception, suppression is appropriate only "if the affidavit supporting the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Spencer*, 530 F.3d at 1007 (quoting *Leon*, 468 U.S. at 923). The executing officers could reasonably have believed that Smith (and his cellphone) would have been inside his apartment at the end of a workday, near dinnertime (*i.e.*, at 5:29 pm). Moreover, Detective Alvarenga's affidavit provided ample reason to believe that Smith's apartment contained cellphones of evidentiary value *in addition* to Smith's (*e.g.*, AS's and AS's mother's).

### III. The District Court Properly Exercised Its Discretion in Permitting the Government's Case Agent To Remain in the Courtroom.

Smith claims (at 30-35) the district court "abused its discretion in summarily denying [his] motion to exclude the case agent without a hearing" (initial capitalization omitted). Specifically, he asserts (at 31), the court "failed to recognize that it had discretion" to sequester FBI Agent Danielle Schnur "despite" the government's pretrial designation of her as its representative pursuant to Fed. R. Evid. 615(b). This claim too fails.

#### A.     Applicable Legal Principles and Standard of Review

Upon a party's request, a court "must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. But "this rule does not authorize excluding . . . an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." Fed. R. Evid. 615(b); *see generally United States v. Cooper*, 949 F.3d 744, 749 (D.C. Cir. 2020) (Rule 615's "'must' command is softened with four exceptions"). "The legislative history of this 'officer or employee' exception to the exclusion requirement makes it

45

clear that Congress intended the exception to apply in a criminal case to an investigative agent of the government." Wright & Miller, *supra*, § 6245. Exempting investigative agents from sequestration "'compares with the situation defense counsel finds himself in—he always has the client with him to consult during the trial.'" Fed. R. Evid. 615 (Advisory Comm. Notes (quoting S. Rep. No. 93-1277)). Moreover, investigative agents "'may be extremely important to government counsel'" when the case "'involves some specialized subject matter.'" *Id.* Finally, sequestration is "a matter within the discretion of a trial judge." *Queen v. WMATA*, 842 F.2d 476, 482 (D.C. Cir. 1988).

## B.    Relevant Procedural History

Almost two weeks before trial, Smith moved to exclude "*all* government witnesses" so they could "not hear the testimony of other witnesses" (JA129). Though recognizing that Rule 615 "does not authorize exclusion" of, among others, the employee of a non-person party "designated as its representative," Smith contended the government had "set forth no basis pursuant to Rule 615" to allow Agent Schnur to remain in the courtroom (JA129). He did not argue that even if she were exempt

from Rule 615 exclusion, the court should nonetheless exercise its "general powers" to exclude her.

In response, the United States set forth its basis for allowing Agent Schnur to remain in the courtroom (ECF #154). Specifically, the United States "designate[d] SA Schnur as its representative, pursuant to FRE 615" (*id.* at 3). As the United States explained, courts routinely "have held that case agents are exempted from sequestration" (*id.* at 1-2 (citing numerous authorities)).

Smith did not respond to the United States' designation of Agent Schnur (see JA30-31).

Thereafter, the district court denied Smith's motion (see JA31 (docketed minute order)). "Every circuit to confront the issue has held that a government's designated case agent in a criminal case falls" within Rule 615(b)'s exception (*id.*). Because the government had "designated" Agent Schnur "as its representative under Rule 615(b)," the court thus concluded she was "exempt from exclusion under Rule 615(b)" (*id.*).

47

### C.    The District Court Properly Declined To Exclude the Government's Designated Representative from the Courtroom.

For the first time, Smith now claims (at 31-32) that, "despite" the government's designation of Agent Schnur as "its representative under Rule 615(b)," the district court had discretion to exclude her from the courtroom pursuant to its "'general powers to manage the conduct of trial'" (quoting *Bradshaw v. Perdue*, 319 F. Supp. 3d 286 (D.D.C. 2018)). Because Smith did not raise this "general powers" claim in the district court, it should be reviewed only for plain error. Alternatively, even assuming Smith adequately preserved this claim, it should be rejected.

Below, Smith never asked the court to exclude Agent Schnur pursuant to its "general powers." To the contrary, Smith claimed only that the government had "set forth no basis pursuant to Rule 615" to allow Agent Schnur to remain in the courtroom and, indeed, "moved th[e] court *pursuant to Rule 615*" to "order that *all* government witnesses" be sequestered (JA129, 131 (first emphasis added)). And, when the government thereafter set forth a Rule 615 "basis" for Agent Schnur's presence, Smith did not respond either by contending, for example, that Agent Schnur did not qualify as the United States' representative or by

48

invoking the district court's inherent powers to nonetheless exclude Agent Schnur. In such circumstances, this Court's review is confined to plain error and Smith has not demonstrated that the district court obviously erred by failing to sua sponte exclude Agent Schnur pursuant to its inherent authority. *See United States v. Burroughs*, 613 F.3d 233, 240-41 (D.C. Cir. 2010) ("'The very word "review" presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance.' The federal rules require that a party timely inform the trial court of either 'the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.'") (quoting Fed. R. Crim. P. 51(b); other citation omitted).

In any event, the district court did not abuse its discretion in declining to exclude Agent Schnur from the courtroom. Smith does not dispute that Agent Schnur fell "within the plain language of the second exception to Rule 615, that for 'designated representatives'" of non-natural parties (such as the United States). *Queen*, 842 F.2d at 481; *see also United States v. Edwards*, 34 F.4th 570, 585 (7th Cir.) (government's "lead investigator" "squarely" fell under Rule 615(b)'s exemption), *cert. denied*, 143 S. Ct. 307 (2022). Instead, Smith asserts (at 10), the district

court "failed to recognize it had discretion to exclude or condition [Agent Schnur's] presence *despite* being designated as the government's representative" (emphasis added). But "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grds*, *Ring v. Arizona*, 536 U.S. 584 (2002); *see also Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997) (same). Accordingly, a "claim that a seasoned judge . . . didn't understand h[er] discretion will rarely, if ever, be successful when built merely on inference." *United States v. Kezerle*, 99 F.3d 867, 870 (7th Cir. 1996). Thus, even if Rule 615 did "'not bar'" the district court from excluding Agent Schnur pursuant to the court's "'general powers,'" as Smith claims (at 31), absent clear evidence to the contrary it must be presumed the court understood it had such authority but chose not to exercise it.[31]

---

[31] Nor did the district court abuse its discretion in declining to hold a hearing on Smith's request to exclude Agent Schnur. Given the United States' pretrial designation of Agent Schnur as its representative and Smith's subsequent failure to challenge that designation (or to suggest that she should be excluded notwithstanding that designation), the district court properly determined that Agent Schnur was "plainly exempt" from Rule 615's compulsory-on-demand exclusion and a hearing was unnecessary (JA31).

At any rate, "[e]ven were [this Court] to conclude that the refusal to sequester [Agent Schnur] was error, [Smith] has made no showing of the 'sufficient prejudice [needed] to require reversal.'" *Queen*, 842 F.2d at 482 n.9 (quoting *United States v. Bobo*, 586 F.2d 355, 366 (5th Cir. 1978)). The evidence of Smith's guilt was overwhelming. In addition to AS's detailed descriptions of Smith's multi-months' sexual abuse of her, there was exceedingly powerful corroborating evidence in the form of Smith's own text messages, which, among other things, directed AS to "get ready to suck some dk," expressed his desire to "eat ur pussy tonight," and ordered AS to "give me better pics of that ass, pussy n tits" (Exhs. 4, 23). Further, consistent with AS's testimony that Smith "always ask[ed] for pictures," law-enforcement authorities recovered numerous "close-up" photos of AS's vagina, anus, and breasts from Smith's computer and Motorola cellphone (10/21/21:99; see notes 9, 11 *supra*). AS's testimony was also corroborated by: her school records (which showed her increased absences once Smith's abuse began); her mother's hospital records (which demonstrated the many opportunities Smith had to abuse AS); and the U-Haul rental records (which corroborated AS's description of Smith's front-seat sexual abuse of her) (see note 11 *supra*). In sum, there were

*many* reasons why the jury convicted Smith of all counts after deliberating less than three hours and without asking any substantive questions (see 10/27/21:95, 110 (jury began deliberations at 2:00 pm and returned its verdicts at 4:57 pm)). Thus, even if Agent Schnur's presence in the courtroom helped her "explain[ ] away" and mitigate[ ]" certain aspects of AS's purportedly "inconsistent" testimony, as Smith claims (at 33-34), such minimal prejudice does not mandate reversal. *See generally United States v. Phibbs*, 999 F.2d 1053, 1073 (6th Cir. 1993) ("Despite the possibility of improper influence, Rule 615[b] allows the government to have any law enforcement officer it wants at its counsel table.").

## IV. The District Court Did Not Plainly Err in Allowing Agent Schnur To Provide Limited Expert Testimony About the Origins of Certain Text Messages on Smith's Motorola Cellphone.

Finally, Smith asserts (at 10, 35-39), the district court abused its discretion in permitting FBI Agent Schnur "to provide opinion testimony interpreting a Cellebrite report regarding a text message" recovered from Smith's Motorola cellphone.

52

## A.    Relevant Procedural History

After being qualified as an expert in cellphone and computer forensics, digital-investigative analyst Daniel Ogden testified about, among other things, images extracted from Smith's Motorola cellphone (10/20/21:42, 85-117). In discussing Exhibit 51A – which was an excerpt of a Cellebrite report depicting text messages between Smith and AS[32] – Ogden identified AS as the "sender" of *all* the texts (10/20/21:185-87). But, FBI Agent Schnur later explained, the messages on the left-hand side of Exhibit 51A (in blue) were found in the Motorola's inbox, "meaning the Motorola received those messages" (10/21/21:261-62). In contrast, the messages on the right-hand side of Exhibit 51A (in green) were found in the Motorola's sent folder, "meaning they had been sen[t] from the Motorola" (10/21/21:262). Following this testimony, defense counsel objected and asked to approach (10/21/21:262).

At the bench conference, defense counsel explained the basis for her objection, noting the government had not "laid the foundation that [Agent Schnur's] an expert" (10/21/21:262). Defense counsel also moved to strike

---

[32] Cellebrite, a tool used by law enforcement, makes "forensic images of digital devices," such as cellphones (10/19/21:77-78).

Agent Schnur's testimony, noting "it's not proper; they have not laid the foundation" (10/21/21:263). Accordingly, the district court directed the prosecutor to "lay a foundation for how – what her expertise is for her to be opining about this," which the prosecutor did (10/21/21:263). Specifically, the prosecutor elicited the following from Agent Schnur: (a) she had "five-plus" years of experience in the child-exploitation field; (b) she had "reviewed about a 100" Cellebrite reports; (c) she was familiar with "the SMS messages area" on a Cellebrite report; and (d) she understood how a Cellebrite report "indicate[d]" whether a text message was "incoming or outgoing" (10/21/21:263-64). Agent Schnur thus knew how to "find" relevant "data" in a Cellebrite report (10/21/21:263). Indeed, Agent Schnur explained, a Cellebrite report "actually specifically indicates if a message is incoming or outgoing to the phone and includes whether it was a sent message or whether it was in the inbox of the phone" (10/21/21:264).

After laying the foundation for Agent Schnur's expertise, the government sought admission of Exhibit 113, which was a "screenshot" Agent Schnur had taken of the Cellebrite report for Smith's Motorola and

54

contained the "same text messages" as Exhibit 51A (10/25/21:71, 74).[33]
Using Exhibit 113 – which the district court admitted over defense
counsel's "[h]earsay" objection – Agent Schnur explained that, although
AS's name was listed in each of the blue and green text-message bubbles
on Exhibit 51A,[34] AS had sent *only* the blue messages (10/25/21:71-73).
As Agent Schnur thus explained, Exhibits 51A and 113 both depicted a
text-message conversation "between [AS], the phone number ending in
3158, and the Motorola," *i.e.*, Smith's cellphone (10/25/21:75).

During cross-examination, Agent Schnur acknowledged that she
had created Exhibit 113 "after" listening to Mr. Ogden's testimony and
that she "wanted to provide clarification as to the direction of th[e] text
messages" reflected in Exhibit 51A (10/25/21:108-09). But, Agent Schnur
also acknowledged, she did not know "who had th[e] Motorola cellphone
at the time" the texts were created and thus didn't know if, for example,
AS or AS's mother had created the texts attributed to Smith
(10/25/21:110).

---

[33] For this Court's convenience, Exhibits 51A and 113 are attached.

[34] AS's name appeared in all of Exhibit 51A's text bubbles simply because
her name was in Smith's Motorola contact list (10/25/21:73).

**B.  The District Court Properly Admitted Agent Schnur's Expert Testimony After the Government Carefully Laid a Foundation for It.**

Smith maintains (at 39) that, "[j]ust as Mr. Ogden's interpretation of the Cellebrite reports was based on 'scientific, technical or other specialized knowledge,' so too was Agent Schnur's." And, Smith further asserts (at 36), Agent Schnur's "interpretation of the Motorola Cellebrite report was inadmissible under [Fed. R. Evid.] 701(c) and 702." Smith, however, has forfeited his Rule 702 claim.[35]

---

[35] The government acknowledges that the admissibility of Agent Schnur's testimony was properly analyzed under Rule 702 rather than Rule 701. After explaining that she had gleaned significant experience with Cellebrite reports through her previous FBI work, Agent Schnur opined about what the Motorola report "mean[t] in [her] experience" (10/25/21:72-73; see also 10/21/21:261-62). In this Circuit, however, "[l]ay opinion is proper when it is based on personal knowledge of events that occurred in the case being tried." *United States v. (Henry) Williams*, 827 F.3d 1134, 1156 (D.C. Cir. 2016). This Court "has 'drawn that line because knowledge derived from previous professional experience falls squarely "within the scope of Rule 702," and thus by definition outside of Rule 701.'" *Id.* (citations omitted); *cf. United States v. Montijo-Maysonet*, 974 F.3d 34, 47-48 (1st Cir. 2020) (because "Rule 701 lets in 'particularized knowledge' that police officers gain on the job," officer permissibly used extraction report to identify origins of text messages recovered from defendant's phone), *cert. denied*, 142 S. Ct. 145 (2021).

56

In response to Smith's complaint that the government had not "laid the foundation that [Agent Schnur's] an expert" (10/21/21:262), the district court instructed the government to do exactly that, namely, "lay a foundation" for "her expertise" (*id.* at 263), which the government did (*id.* at 263-64). After the government laid this foundation, Smith did not challenge it (see *id.* at 264). Indeed, even after the court recessed the trial for the weekend in the midst of Agent Schnur's testimony, Smith did not challenge any aspect of Agent Schnur's expertise when the parties returned (see 10/25/21:2-70).[36] Nor did Smith ever suggest that he was prejudiced by any pretrial failure to notice Agent Schnur as an expert. *See* Fed. R. Crim P. 16(a)(1)(G). Because the district court instructed the government to address Smith's "foundation" objection, the government did so, and Smith did not thereafter suggest the government had laid an inadequate foundation, his present claim is confined to plain-error review. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) ("In federal criminal cases, Rule 51(b) tells parties how to preserve claims of error:

---

[36] After his initial "foundation" objection, Smith only made a "[h]earsay" objection when the government moved for Exhibit 113's admission (10/25/21:71), a claim he does not repeat on appeal.

'by informing the court – when the court ruling or order is made or sought – of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.'").

In any event, the district court certainly did not err – let alone plainly so – by either failing to strike the testimony given by Agent Schnur *before* Smith objected or by precluding Agent Schnur from testifying *after* the government had laid a foundation for her testimony under Rule 702. As defense counsel's silence following Agent Schnur's description of her experience and credentials suggests, Agent Schnur was certainly qualified to offer an expert opinion about what the Cellebrite report showed regarding the origins – "sent" or "received" – of the Motorola text messages.

> Rule 702
>
> provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may testify about his or her opinion where: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

*(Henry) Williams*, 827 F.3d at 1156 (quoting Fed. R. Evid. 702)). "The district court's decision to admit or exclude expert testimony is reviewed for abuse of discretion." *United States v. Kelsey*, 917 F.3d 740, 747 (D.C. Cir. 2019).

In laying the foundation for Agent Schnur's testimony about the Motorola Cellebrite report, the government satisfied Rule 702. ***First***, Smith understandably does not dispute that Agent Schnur's specialized knowledge was helpful to the jury. Identifying who said what in the contemporaneous text messages exchanged between AS and Smith undoubtedly helped the jury comprehend AS's testimony about Smith's ongoing sexual abuse. ***Second***, although Smith complains (at 38-39) that Agent Schnur didn't say "she was Cellebrite certified" and alleges she "arrive[d] at her conclusions" through "sporadic observations of other reports," the record demonstrates that Agent Schnur had "reviewed" approximately "100 or so" Cellebrite reports during her five years with the FBI's child-exploitation section. This extensive experience belies any suggestion of inadequate "sporadic observations" and provided the district court with sufficient grounding to qualify her as an expert on

Cellebrite reports.[37] **Third**, without any objection from Smith, the district court had previously qualified Mr. Ogden as an expert in "cellphone forensics" and the tool that Mr. Ogden uses is Cellebrite (10/20/21:41-42, 53). The court's unobjected-to qualification of Mr. Ogden thus generally demonstrated the reliability of that forensic tool. **Finally**, the government established that Agent Schnur reliably applied her Cellebrite knowledge in this case. Based on her previous review of approximately 100 Cellebrite reports, Agent Schnur gained specific knowledge about a Cellebrite report's "SMS messages area" and an understanding of how such reports indicated whether a message was "incoming or outgoing" (10/21/21:263-64). Indeed, as Smith himself concedes (at 38), Agent Schnur testified that, based on her experience, she "knew where to find data in Cellebrite." Accordingly, in strict adherence to the district court's instruction that the government "lay a

---

[37] *See*, *e.g.*, *United States v. Bostick*, 791 F.3d 127, 146 (D.C. Cir. 2015) (agent qualified based on, *inter alia*, "'training and experience on hundreds of investigations'"); *United States v. Smith*, 640 F.3d 358, 366 (D.C. Cir. 2011) (agent "would have" been qualified based on, *inter alia*, "hundreds of drug investigations"); *Cf. United States v. (John) Williams*, 212 F.3d 1305, 1309 (D.C. Cir. 2000) ("[f]ewer than one dozen arrests involving possession of a firearm is not sufficient grounding to qualify him as an expert under Rule 702").

foundation" for Agent Schnur's "expertise" (10/21/21:263), the government met Rule 702's requirements. *See United States v. Morgan*, 45 F.4th 192, 200-04 (D.C. Cir.), *cert. denied*, 143 S. Ct. 510 (2022).

## C.    Any Error Was Harmless.

If this Court agrees that Smith forfeited his Rule 702 claim by failing to challenge the foundation for Agent Schnur's testimony, Smith must establish a clear or obvious error that affected his substantial rights. *United States v. Eiland*, 738 F.3d 338, 363-64 (D.C. Cir. 2013). Further, this Court reverses only if "'the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* In contrast, under the harmless-error standard of Fed. R. Crim. P. 52(a), this Court "disregard[s] a non-constitutional evidentiary error" only if the government demonstrates it didn't have "'a "substantial and injurious effect or influence in determining the jury's verdict."'" *Smith*, 640 F.3d at 366 (quoting, *inter alia*, *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Even assuming error, reversal would be unwarranted under either standard.

If this Court applies the plain-error standard, it must affirm. Smith has not attempted to show that any error affected his substantial rights.

Nor has he demonstrated that this Court must exercise its discretion and correct the error in order to preserve the fairness, integrity, or public reputation of the judicial proceeding. Indeed, without any elaboration, Smith claims (at 39) only that the district court's error "undermined the defense."

Alternatively, if this Court reviews for harmless error, it can be confident that Agent Schnur's limited testimony about the origins of certain text messages did not substantially influence the jury's verdicts. As described in Part III.C *supra*, the evidence of Smith's guilt was overwhelming. Moreover, even if Agent Schnur's testimony were inadmissible on the grounds that the jurors could have easily inferred from the wording and context of the texts that the green-bubbled messages depicted on Exhibit 51A came from Smith and the blue-bubbled messages came from AS, that would itself undermine any concern that such testimony was prejudicial. Further, the texts depicted on Exhibits 51A and 113 are not remotely sexual. Finally, Smith used her cross-examination of Agent Schnur to reinforce a critical point of her defense: Agent Schnur admitted that she could not say who had had Smith's Motorola cellphone when the messages were sent. See, e.g., 10/27/21:81

(defense closing: "one thing you don't have any information about is that Mr. Smith had that phone when those messages were open, sent, and that he saw them").

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
CAROLINE BURRELL
MONA SEDKY
Assistant United States Attorneys

_____/s/_____
DAVID B. GOODHAND
D.C. Bar #438844
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,931 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____
DAVID B. GOODHAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Jonathan Zucker, Esq., jonathanzuckerlaw@gmail.com, on this 20th day of March, 2023.

/s/
_____
DAVID B. GOODHAND
Assistant United States Attorney

ADDENDUM

**Exhibit 51A**



## Extraction Report - Cellebrite Reports

## Participants

+12023683158

████████ *

(202) 368-3158

████████

## Conversation - SMS Messages (11)

+12023683158 ████████

I throw up

11/17/2016 1:44:09 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x62401
(Table: sms, Size: 434176 bytes)

+1 202-368-3158 ████████

What's wrong

11/17/2016 1:48:40 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x623AE
(Table: sms, Size: 434176 bytes)

+12023683158 ████████

I ate a burger that we order and after that I threw it up everything even my juice I threw up

11/17/2016 1:54:10 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x622FD (Table: sms, Size: 434176 bytes)

+1 202-368-3158 ████████

Ok I'm not near hold on to school is out

11/17/2016 1:55:16 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x6228C
(Table: sms, Size: 434176 bytes)

+12023683158 [redacted]

Ok

11/17/2016 2:03:38 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x620A3
(Table: sms, Size: 434176 bytes)

+1 202-368-3158 [redacted]

I texted ms.tunner n asked if she could let U go home early cause U r sick waiting for her answer

11/17/2016 2:06:41 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61F81 (Table: sms, Size: 434176 bytes)

+12023683158 [redacted]

Ok

11/17/2016 2:07:22 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61F29
(Table: sms, Size: 434176 bytes)

+12023683158 [redacted]

Walking

11/17/2016 3:19:44 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61DAA
(Table: sms, Size: 434176 bytes)

+1 202-368-3158 [redacted]

Ok

11/17/2016 3:29:08 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61D61
(Table: sms, Size: 434176 bytes)

+12023683158 [redacted]

I'm home

11/17/2016 3:55:25 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61CBD
(Table: sms, Size: 434176 bytes)

(202) 368-3159 ▓▓▓▓▓▓

Ok

11/17/2016 4:25:56 PM(UTC-5)

Source Extraction:
Physical
Source Info:
userdata/Root/data/com.android.providers.telephony/databases/mmssms.db : 0x61C74
(Table: sms, Size: 434176 bytes)

# Exhibit 113

USCA Case #22-3015    Document #1990936    Filed: 03/20/2023    Page 82 of 83

## SMS Messages (692)

1 Filters applied ▾   Clear filters                                                🏷 ▾  ⧉  ⧉  ⧉  🔍   Export ▾   Filters ▾   Actions ▾

| | ↓ Timestamp | Delivered | Folder | Parties | Body | Status |
|---|---|---|---|---|---|---|
| ↙ | 11/17/2016 3:55:25 PM(UTC-5) | 11/17/2016 3:55:23 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | I'm home | Read |
| ↗ | 11/17/2016 3:29:08 PM(UTC-5) | 11/17/2016 3:29:13 PM(UTC... | Sent | To: +1 202-368-3158 ▮▮▮ | Ok | Sent |
| ↙ | 11/17/2016 3:19:44 PM(UTC-5) | 11/17/2016 3:19:43 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | Walking | Read |
| ↙ | 11/17/2016 2:07:22 PM(UTC-5) | 11/17/2016 2:07:20 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | Ok | Read |
| ↗ | 11/17/2016 2:06:41 PM(UTC-5) | 11/17/2016 2:06:46 PM(UTC... | Sent | To: +1 202-368-3158 ▮▮▮ | I texted ms.tunner n asked if she could let U go home early cause U r... | Sent |
| ↙ | 11/17/2016 2:03:38 PM(UTC-5) | 11/17/2016 2:03:36 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | Ok | Read |
| ↗ | 11/17/2016 1:55:16 PM(UTC-5) | 11/17/2016 1:55:49 PM(UTC... | Sent | To: +1 202-368-3158 ▮▮▮ | Ok I'm not near hold on to school is out | Sent |
| ↙ | 11/17/2016 1:54:10 PM(UTC-5) | 11/17/2016 1:54:08 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | I ate a burger that we order and after that I threw it up everything eve... | Read |
| ↗ | 11/17/2016 1:48:40 PM(UTC-5) | 11/17/2016 1:48:45 PM(UTC... | Sent | To: +1 202-368-3158 ▮▮▮ | What's wrong | Sent |
| ↙ | 11/17/2016 1:44:09 PM(UTC-5) | 11/17/2016 1:44:05 PM(UTC... | Inbox | From: +12023683158 ▮▮▮ | I throw up | Read |